**Richard J. BENNETT, Plaintiff-Appellant,**

v.

**James S. FLANIGON, Elmo G. Kuecks and Great Central Agency Corporation, Defendants-Appellees.**

**No. 11302.**

United States Court of Appeals, Seventh Circuit.

April 5, 1955.

William J. Voelker, Jr., R. Jack Ott, Peoria, Ill., Clarence W. Heyl, Heyl, Royster & Voelker, Peoria, Ill., John R. Cronin, Nashua, Iowa, for appellant.

Donald L. Thompson, Meyers & Matthias, Chicago, Ill., for appellees.

Before FINNEGAN, LINDLEY and SWAIM, Circuit Judges.

LINDLEY, Circuit Judge.

Plaintiff brought this action for an accounting by defendants for property and profits growing out of the individual defendants' ventures as insurers of mercantile establishments against losses arising from criminal activity. Defendants answered, denying all material averments of the complaint and asserting separate affirmative defenses grounded on the Illinois statute of limitations and on their statement that plaintiff had, on September 18, 1934, for a valuable consideration, severed all connection with the Great Central Protective Association, a corporate insurer then operated by plaintiff and the individual defendants as its officers and board of directors. The relevance of the latter defense will be clarified by our later discussion of the factual allegations of the complaint and the evidence.

After taking plaintiff's deposition, defendants moved for summary judgment on the ground that the pleadings, the deposition and an affidavit of defendant Kuecks showed that they were entitled to judgment as a matter of law. Plaintiff appeals from an order allowing the motion. The only issue before us is whether that ruling was erroneous.

The material substantive averments of the complaint are, in substance, that the parties entered into a joint venture to organize companies to insure mercantile establishments against losses growing out of robberies and like criminal activities; that plaintiff contributed an already organized business to the venture, which was later incorporated; that the individual defendants fraudulently induced plaintiff to sever his connection with the enterprise by misrepresentations that the corporation was defunct and would have to be dissolved; that plaintiff was denied access to the corporate books and records, as a part of the allegedly fraudulent scheme, and that plaintiff diligently seeks to recover the losses which resulted from the alleged fraud.

These averments are refuted by his own testimony by way of deposition. Plaintiff testified that in 1931 he organized an association of small merchants, under the name and style of Central States Protective Service, designed to afford protection to the members against losses growing out of robberies and burglaries. The service afforded was not a new idea; its only novel feature was the method of premium collection, in the form of small monthly dues payments. This was a hand to mouth operation conducted from plaintiff's home in Danville, Illinois, and, beginning in 1933, from his home in Peoria. Membership dues collected were intermingled with his personal funds and used indiscriminately for personal expenses or association expenses as needed. Thus claims by members for losses were paid from his personal funds, and, in some instances, from money borrowed from his brother-in-law. No reserves were maintained. At all times, plaintiff was regularly employed, first, as an agent for Ben Hur Life Insurance Company, and, later, as manager of a restaurant. The Service was an unincorporated personal operation. There were no bylaws, and no meeting of the members was ever held. Several parties,

including defendant Flanigon, were informally associated with the Service from time to time as commission agents for the sale of memberships. Thus, plaintiff testified that he met Flanigon while he was employed by Ben Hur. During a discussion of the Service between the two, Flanigon suggested that he sell some memberships. It was agreed that he might do so. Plaintiff thought that Flanigon procured some memberships, but did not know how many.

In the early part of 1933 plaintiff received a letter from the insurance department of the State of Illinois requesting information about the Service, but he never answered it. Later, a conference was had between plaintiff and Flanigon concerning an attempt to get the operation sanctioned under the laws of some state. In early 1934 plaintiff asked Flanigon that the latter come into the business and help make a go of it. Shortly thereafter, Flanigon suggested that the records, consisting of a ledger and a card file, be turned over to defendant Kuecks. Accordingly, the records were then delivered to Flanigon and, from that time on plaintiff did not see them. In April, 1934, he suggested to Kuecks that he would like to see them. Kuecks is quoted as replying " 'I'm too busy now.' " No other request was ever made to see the office files. Plaintiff does not know what amount of money, if any, Flanigon and Kuecks collected from the members. Sums collected by plaintiff thereafter were used by him to pay "claims or my own personal expenses."

Plaintiff testified that he first met Kuecks after the file was delivered to Flanigon. Shortly before April 6, 1934, plaintiff went with Flanigon and Kuecks to the offices of attorney Kitchell, who, Flanigon said, had " 'conceived a way of forming this Great Central Protective Association to the betterment of our former plan.' " Through Kitchell's efforts the Association was incorporated under the laws of the State of Illinois on April 6, 1934, as a non-profit corporation, empowered "to unite the owners of small businesses" into an association to protect

themselves from criminals who indulge in crimes against mercantile businesses. Among other services recited in the certificates of membership, was the insurance of the members against losses growing out of crimes of the described nature. Plaintiff, Flanigon and Kuecks were the incorporators. Plaintiff was a member of the Association, although he did not remember having paid any dues. He became an officer, director and chairman of the board. He invested no money in the corporation except "any money taken in from the Central States Protective Service, which was mine." He did not know whether any such money had been "taken in" by Flanigon or Kuecks or, if so, whether it had been invested in the Association. He devoted no time to the business except "as a director and chairman of the board and trying to endeavor people to sell certificates." In the latter role, plaintiff believed he "contacted some fellows in Iowa." He continued in the restaurant business and sold no memberships himself.

Two efforts were made by plaintiff and the individual defendants to form an insurance company in the State of Iowa. They, together with certain persons designated as financial backers, conferred with an official of the Insurance Commissioner's office in Des Moines shortly prior to April 6, 1934. With Kitchell as their spokesman, they again conferred with an Iowa official shortly after the Association was incorporated in Illinois. Both attempts failed because the parties could not meet the requisite financial standing.

Plaintiff had some part in the affairs of the Association as a director until June 26, 1935. He stated that his only participation in the corporate affairs was in countersigning checks drawn against it and brought to the restaurant from time to time by Flanigon and Kuecks. He had never been in the corporation's office, but had not been denied access thereto; he had never sought to go to the office or take part in office functions.

On June 26, 1935, plaintiff signed a paper which evidenced his indebtedness

to the Association for certain stated sums, and tendered his resignation as an officer, director and member, contingent on his failure to abide by the terms for repayment provided therein and on the payment to him of $50 cash by the Association. On September 18, 1935, he signed an indorsement on the same paper acknowledging receipt of $50 and declaring his resignation absolute. He testified that no money had been advanced to him by the Association prior to that date, when he received the $50; that he had signed the papers without reading them, but that no one prevented him from reading them; that Kitchell had told him, prior to June 26 that the Association was defunct and would have to be dissolved and that he had assumed that the papers signed were a part of the legal dissolution. He made no attempt to examine the corporate records or to determine the financial condition of the enterprise. He made no inquiry as to whether the Association was ever dissolved, and he did not participate further in its affairs.

In 1936 he left Peoria and since that time has resided at Springfield, Illinois, and at various places in the State of Iowa. He thought no more of the Association until, in 1948, he purchased a policy from an agent of the Great Central Mutual Insurance Company. When and how it came into existence does not appear. He then learned that Flanigon and Kuecks were associated with the company and surmised that it was a continuation in new form of the original Association. He consulted an attorney. An investigation was conducted. Thereafter, for the first time, he read the papers he had signed on June 26 and September 18, 1935, and thereby learned of their content. The complaint at bar was filed on April 21, 1952. Plaintiff testified that he assumed that the allegations of his complaint were true, but refused, on advice of counsel, to answer the question whether he had made any effort to ascertain before it was filed whether the averments made therein were true.

Reference need be made to only one other document of record, namely, a contract, executed on June 5, 1935, between Kitchell and the Association, and ratified on behalf of the latter by the signatures of all members of its board of directors, including that of plaintiff. This instrument states that the plan of organization and procedure of the corporation had been formulated by Kitchell and that the latter, for a stated consideration, including a percentage of all membership dues, assigned all right and title to the plan to the Association.

The testimonial and documentary evidence conclusively refutes the material factual averments of the complaint. Plaintiff stated without equivocation that the Protective Service was his baby. That he so considered it, even after he delivered the files and records to Flanigon in 1934, is evidenced by his testimony to the effect that dues received by him thereafter were used to pay his own personal expenses and his further statement that any moneys received by Flanigon and Kuecks on behalf of the Service and invested in the Association were his. Thus, except for the employment of Flanigon as a commission agent for the Service, plaintiff's association with the individual defendants was limited to that of an incorporator of the Association and, thereafter, an officer, director and member of that organization. Any agreement between them as to profits is clearly refuted by reference to the charter of the corporation whose existence was authorized only as a non-profit institution. As a member of such organization plaintiff was entitled to the benefits common to all members in accord with the provisions of the corporate charter and by-laws. As an officer and director he was entitled only to such remuneration as the board might fix from time to time pursuant to the by-laws. His rights in each capacity were terminated when his resignation was made absolute by his signature on the document on September 18, 1935. He can not with good grace rely on his assertion that "I did not read the paper."

From his own testimony it appears that, at the times when the papers were presented to him for his signature, no representation was made to him by anyone as to their content, and further, that no one prevented his reading them. It also appears that he was never denied access to the corporate books and records at any time material herein because, by his own admission, he made no attempt to examine them; he addressed no request for access to them to their custodian. By his own admission, he made no attempt to ascertain the financial condition of the corporation, at the time he submitted his resignation. He fails utterly to connect the corporate defendant with any of his own activities.

Thus it appears affirmatively that his claim stated on paper became completely disintegrated when exposed to the light of his own deposition. We need enter into no lengthy discussion of summary judgment practice, for it affirmatively appears that no issue as to any material fact remains in the case. Repsold v. New York Life Ins. Co., 7 Cir., 216 F.2d 479; Sprague v. Vogt, 8 Cir., 150 F.2d 795; Ramsouer v. Midland Valley R. R. Co., 8 Cir., 135 F.2d 101. The judgment is

Affirmed.