KICKAPOO TRIBE OF OKLAHOMA, Johnny Ortega, a minor child through next friend, Vernon Ketcheshawno, Herbert White, Bob White, Delores Murdock, Joyce Naneto, Ruth Sanderson, James Wahpepah, Emma Gonzales, Fredrico Gonzales, Emma Salazar, Fredrico Salazar, Antonio Anico and Vernon Ketcheshawno, Plaintiffs-Appellees,

v.

Lloyd RADER, Debra Roth, Joanna Romero, Victoria Burkes, Andres Martinez, Helen Martinez, George Miller, Cheryl Mullin, Jane Conner, Earline Logan, Dian England, Defendants-Appellants,

State of Oklahoma, Department of Human Services, Defendant In Intervention-Appellant,

Betty Davis, the Hon. Arthur Lory Rakestraw, the Hon. Judge Loys Criswell, and Department of Human Services, Defendants.

No. 84-2279.

United States Court of Appeals, Tenth Circuit.

July 2, 1987.

Thomas H. Tucker, State of Oklahoma Dept. of Human Services, Oklahoma City, Okl. (Pamela K. Padley, was also on brief), for defendants-appellants Lloyd Rader, Debra Roth, Joanna Romero, Victoria Burkes, George Miller, Cheryl Mullin, Jane Conner, Earline Logan and Dian England.

Boyd Baker, Altus, Okl., for defendants-appellants Andres Martinez and Helen Martinez.

Sue Wycoff, Oklahoma Indian Legal Services, Oklahoma City, Okl. (Susan Work Haney, Oklahoma City, Okl. and Mary Barksdale, Tahlequah, Okl., were also on brief, for plaintiff-appellee Kickapoo Tribe), Albert Ghezzi and Berry Benefield, Native American Center, Oklahoma City, Okl., for plaintiff-appellee Antonio Anico.

Before HOLLOWAY, Chief Judge, DOYLE, Circuit Judge*, and BROWN, District Judge**.

HOLLOWAY, Chief Judge.

This appeal generates several difficult legal issues involving the application of the Indian Child Welfare Act of 1978 (ICWA)[1], the role of federal and state courts in the adoption proceedings of an Indian child, Johnny Ortega, the recognition by federal courts of state court judgments construing federal statutes, and the due process rights of an Indian father who speaks no English.

# I

## Factual Background

### A.

Johnny Ortega was born on October 5, 1977. Johnny's biological parents are Sylvia Marquez Ortega and Antonio Anico, an enrolled member of the Kickapoo Tribe of Oklahoma.

In March 1978, Sylvia took Johnny, then five months old, to the Children's Memorial Hospital in Oklahoma City for treatment of an arm disorder. Physicians at the hospital suspected child abuse or neglect and alerted the Oklahoma Department of Human Services (DHS). Johnny was placed in the emergency custody of DHS on March 9, 1978, by state court order. On March 10, DHS filed a petition in the District Court of Oklahoma County seeking to have Johnny made a ward of the court as a deprived child and to have the parental rights to Johnny terminated. The petition listed Antonio Anico as the father and gave his address as "Mexico." At that time Mark Litke, a DHS agent, filed an "Affidavit For Service By Publication" with the state court which recited:

> that the present whereabouts of the father of said child is unknown to your petitioner; that after due search and diligent inquiry your affiant has been unable to ascertain an address at which personal service may be given and that affiant wishes to obtain service by publication.

(I R. 53).

The Oklahoma County District Court order of March 9, 1978, had placed custody of Johnny with DHS and set the matter for hearing on April 26, 1978. Moreover, the court directed that "notice of hearing be given to parents of the child either by personal service or by publication in the manner provided by law." (I R. 51). A

---

* The late Honorable William E. Doyle heard the argument of the appeal but did not participate in this opinion.

** The Honorable Wesley E. Brown of the District of Kansas, sitting by designation.

1. 25 U.S.C. §§ 1901 through 1923.

March 9, 1978 affidavit by Juvenile Officer Litke of Oklahoma County had stated that the whereabouts of the father were unknown to petitioner Litke, that after due search and diligent inquiry Litke had been unable to ascertain an address for personal service, and that he wished to obtain service by publication. (*Id.* at 53). Service on Antonio Anico was by publication of a notice of the April 26, 1978 hearing to terminate parental rights in the Daily Law Journal-Record of Oklahoma City. The notice was published once in English on March 11, 1978. The notice was addressed to "Antonio Aneco [sic]" and stated that a petition alleging that Johnny Ortega was a deprived child and for termination of parental rights had been filed, and that a hearing would be held on the cause on April 26, 1978, where he might appear to be heard.[2] On March 17, 1978, DHS returned custody of Johnny to Sylvia Ortega.

On April 26, 1978, on the basis of evidence of a new skull injury, the state court entered an order making Johnny a ward of the court as a deprived child. Visitation rights were granted to the mother and stepfather twice a month. Although it is not clear from the record on appeal, the hearing of April 26, 1978, where Antonio Anico's parental rights to Johnny were to be terminated appeared to be continued to September 7, 1978. There is no showing in our record of further notice attempted on Antonio. On May 9, 1978, DHS placed Johnny in a foster home.

On September 7, 1978, the District Court of Oklahoma County terminated the parental rights of Antonio Anico to Johnny Ortega. (I R. 56). Neither Antonio nor his representative was present at the termination hearing.

On November 3, 1978, the Indian Child Welfare Act became law, in part effective immediately, and in part effective May 8, 1979. DHS possessed information suggesting that Johnny was an Indian child on September 12, 1979, and communicated that information to the Oklahoma County District Court on or about October 2, 1979. Nevertheless on October 7, 1979, DHS moved Johnny from the foster home where he was placed on May 9, 1978, to another non-Indian foster home.

On May 1, 1980, the District Court of Oklahoma County terminated the parental rights of Sylvia Ortega to Johnny Ortega, with the court reserving the right to consent to adoption. On September 4, 1980, some two years after Antonio Anico's parental rights were terminated and one day before Johnny was placed for adoption by DHS, an Order Nunc Pro Tunc was entered by the District Court of Oklahoma County finding:

That on the 7th day of March, 1978 this Court found that the whereabouts of Antonio Aneco [sic], alleged natural father of the referenced juvenile, were unknown and that a diligent effort had been made to ascertain the whereabouts of the alleged natural father.

That as a result of such findings, this Court authorized the publication of notice to Antonio Aneco [sic].

2. The notice in full read as follows (I R. 54):
(5256)
**NOTICE OF HEARING**
No. JF–78–386
In the District Court of Oklahoma County, State of Oklahoma.
**In the Matter of Johnny Ortega, an Alleged Deprived Child.**
THE STATE OF OKLAHOMA TO: Antonio Aneco [sic].
YOU ARE HEREBY NOTIFIED that a duly certified petition has been filed in the Juvenile Division of the District Court of Oklahoma County, Oklahoma, alleging said child to be deprived and praying for termination of parental rights and praying that said child be brought before this Court to be dealt with according to law.

YOU ARE FURTHER NOTIFIED that said cause is set for hearing the **26th day of April, 1978, at 1:30 P.M.** in the Courtroom of Judge Stewart Hunter at the County Courthouse, Oklahoma City, Oklahoma, when and where you may appear to be heard.
YOU ARE FURTHER ADVISED of your right to be represented by counsel of your choice at said hearing.
Dated this 10th day of March, 1978.
DAN GRAY,
Court Clerk
By Debra Thomas, Deputy
(Seal)
(8–11–78)

Through clerical error these findings were not recorded or reflected in the court file in this matter. This clerical record should be corrected.

(I R. 55). This order was issued by a judge different than the one presiding over the March 10, 1978 hearing.[3] The following day, DHS placed Johnny for adoption in the home of Andres and Helen Martinez, non-Indians.

On November 3, 1980, the Kickapoo Tribe attempted to intervene in the state court proceedings pursuant to 25 U.S.C. § 1911(c), with the purpose of transferring the case to the Indian Tribal Court so that the Kickapoo tribe could place the child in accordance with Kickapoo custom, pursuant to the ICWA. (I R. 32). The state court denied the Kickapoo Tribe's petition to intervene, finding that the ICWA did not apply to any proceeding under state law for foster care placement or termination of parental rights which was initiated prior to May 8, 1979. (*Id.* at 33).

The Oklahoma County District Court terminated the parental rights of Sylvia Ortega to Johnny on May 1, 1980. On November 25, 1980, Andres and Helen Martinez filed a petition to adopt Johnny in the District Court of Jackson County, Oklahoma. On February 26, 1981, that court entered a decree granting the adoption. The state court found that DHS "did not receive reliable confirmation of any Indian heritage of this child [Johnny] until December fo [sic] 1980." (II R. 300).

### B.

Plaintiffs-appellees commenced this action in July 1981, in the United States District Court for the Western District of Oklahoma, alleging violations of the Due Process Clause of the Fourteenth Amendment, the ICWA, and the Indian Religious Freedom Act.[4] The plaintiffs sought declaratory and injunctive relief as well as damages. At the pretrial conference in the federal district court, the parties entered into certain stipulations which are relevant

on appeal. The stipulations include these facts: (1) Antonio Anico is an enrolled member of the Kickapoo Tribe of Oklahoma; (2) the district courts of Oklahoma and Jackson Counties did not follow the placement preferences of the ICWA in the foster care and adoptive placement of Johnny; (3) the Kickapoo Tribe was not given notice of the state court proceedings involving Johnny; (4) the ICWA was not in effect on September 7, 1978, the date on which Antonio Anico's parental rights to Johnny were terminated; and (5) the Kickapoo Tribe of Oklahoma has certified that Johnny is eligible for membership in the tribe. (II R. 383–85).

On cross-motions for summary and partial summary judgment, the district court held (1) that the defendants-appellants had violated the ICWA in the foster care placement and adoption of Johnny; (2) that the plaintiff Antonio Anico's parental rights to Johnny were terminated without adequate notice in violation of the Due Process Clause, and in doing so the defendants had also violated the relevant Oklahoma notice statute; (3) that the adoption of Johnny by Helen and Andres Martinez was void *ab initio;* and (4) that the determination of custody and placement of Johnny must be re-determined by the state courts of Oklahoma in accordance with the ICWA. Judgment was then entered pursuant to Rule 54(b), Fed.R.Civ.P. Still remaining for disposition by the district court are issues concerning injunctive relief and damages.

The defendants-appellants appeal the order of the federal district court. By agreement of the parties, the judgment of the district court insofar as it affects the custody of Johnny was stayed pending the outcome of this appeal. We affirm in part, reverse in part, and remand.

## II

### Antonio Anico's Due Process Rights

The plaintiff Antonio Anico claims that he was denied procedural due process of

---

3. There is no indication in the record that notice was sent to the parties regarding the nunc pro tunc order.

4. 42 U.S.C. § 1996.

law as guaranteed to him by the Fourteenth Amendment. Specifically, he contends that he was not provided adequate notice of the hearing of September 7, 1978, at which his parental rights to Johnny Ortega were terminated by the District Court of Oklahoma County. The defendants vigorously disagree, stating that the notice by publication in the Oklahoma City legal newspaper was adequate in these circumstances.

"Many controversies have raged about the cryptic and abstract words of the Due Process Clause but there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 656–57, 94 L.Ed. 865 (1950). "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* at 314, 70 S.Ct. at 657 (citations omitted).

The right to raise one's children is "far more precious ... than property rights." *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972) (quoting *May v. Anderson*, 345 U.S. 528, 533, 73 S.Ct. 840, 843, 97 L.Ed. 1221 (1953)). In *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), the Supreme Court expressly held that "state intervention to terminate the relationship between [a parent] and [a] child must be accomplished by procedures meeting the requisites of the Due Process Clause" and that the interest of a parent in avoiding the termination of his parental rights is important enough to entitle him to the procedural protections embodied in the Due Process Clause. *See id.* at 749, 753–54, 102 S.Ct. at 1394–95; *Armstrong v. Manzo*, 380 U.S. 545, 550, 85 S.Ct. 1187, 1190, 14 L.Ed.2d 62 (1965); *see also Blair v. Supreme Court of*

*Wyoming*, 671 F.2d 389, 390 (10th Cir.1982) (relationship between parent and child is constitutionally protected); *Wise v. Bravo*, 666 F.2d 1328, 1336 (10th Cir.1981) (Seymour, J. concurring) (right to relationship with one's child is a liberty interest protected by the Due Process Clause). Such critical rights are clearly implicated here since it is undisputed that Antonio Anico is the biological father of Johnny Ortega.[5]

Okla.Stat. tit. 10, § 1131 explicates the standards for providing notice of a hearing to terminate parental rights:

A parent shall be given actual notice of any hearing to terminate his parental rights. The notice shall indicate the relief requested, and the hearing shall not be held until at least ten (10) days after the receipt of such notice, except with the consent of the parents, if known. *If the Court finds that the whereabouts of the parent cannot be ascertained, it may order that notice be given by publication and a copy mailed to the last-known address of the parent.* The notice shall be published once in a newspaper of general circulation in the county in which the action to terminate the parental rights is brought, and the hearing shall not be held for at least ten (10) days after the date of publication of the notice. Where a parent has not received actual notice of the hearing at which he is deprived of his parental rights, the order depriving him of those rights shall not become final for a period of six (6) months after the hearing. Nothing in this section shall prevent a court from immediately taking custody of a child and ordering whatever action may be necessary to protect his health or welfare.

For the purpose of terminating parental rights, a father or putative father of a child born out of wedlock who has not, prior to commencement of a proceeding to terminate parental rights to such child, exercised parental rights and duties shall not be deemed to have paren-

---

5. Antonio Anico has asserted paternity. Johnny's mother, Sylvia Ortega, acknowledges Anto-

nio as Johnny's father.

tal rights to such child, but the father shall be given notice of an opportunity to be heard on the issue of whether or not he has exercised parental rights and duties. When the address or identity of the putative father is unknown, the court may waive the giving of notice by publication, but when the giving of notice by publication is waived the order terminating parental rights shall not become final for a period of fifteen (15) days from the date of the order. (Emphasis added).

■ The Supreme Court of Oklahoma has held that § 1131 requires a parent be given actual notice of any hearing to terminate parental rights. "If and only if the court finds the whereabouts of the parents cannot be ascertained, may notice be given by publication." *Tammie v. Rodriquez*, 570 P.2d 332, 334 (Okla.1977). In addition to publication, a copy of the notice must be mailed to the parents' last known address if such address can be ascertained with due diligence. *See Dana P. v. State*, 656 P.2d 253, 257 (Okla.1983); *Tammie*, 570 P.2d at 334.

It is as true now as it was in 1940 when Justice Jackson observed that "[p]ublication may theoretically be available for all the world to see, but it is too much in our day to suppose that each or any individual ... does or could examine all that is published to see if something may be tucked away in it that affects his property interests." *Mullane*, 339 U.S. at 320, 70 S.Ct. at 660; *see also Cate v. Archon Oil Co., Inc.*, 695 P.2d 1352, 1356 (Okla.1985). Thus, "[g]reat caution should be used not to let fiction deny the fair play that can be secured only by a pretty close adhesion to fact." *McDonald v. Mabee*, 243 U.S. 90, 91, 37 S.Ct. 343, 343, 61 L.Ed. 608 (1917) (citation omitted).

In *Mullane* the Supreme Court did not prohibit the use of publication in all circumstances as a means of providing constitutionally adequate notice. The Court held that publication is still a valid means of providing notice as to persons whose whereabouts could not with "due diligence" be ascertained. 339 U.S. at 317, 70 S.Ct. at 659. Section 1131 as construed by the Supreme Court of Oklahoma is not unconstitutional on its face. However, the critical question in the instant case is the basis for notice by publication—whether there was "due diligence" under *Mullane* to justify such a departure from the constitutional norm of service of notice.

■ We are convinced that the district court here properly held that the premise for notice by publication was fatally defective so that the attempted notice by publication did not afford due process. From the record it is unmistakably clear that no diligent efforts were made to ascertain the whereabouts or address of Antonio Anico. For reasons that follow, we therefore uphold the district court's conclusion that the statute, as applied here, denied due process.

DHS Agent Litke made the affidavit for service by publication, stating that "*after due search and diligent inquiry your affiant has been unable to ascertain an address at which personal service may be given and your affiant wishes to obtain service by publication.*" (I R. 53) (emphasis added). However Litke testified in federal court that he did not gather the information in the praecipe or the petition filed in the state court. (VIII R. 13). He did not remember talking to any particular case worker on the case. His statement as to the father's whereabouts was not "based on any independent information gathered by [him]." (*Id.* at 13). He said specifically that "he did not know" what efforts would have been made by the Protective Service office or the caseworker to locate the father. (*Id.* at 16). He said that if he felt that information he received was insufficient to file a petition, he would either make further inquiry, "or would have filed it with her information only, or something along that line." (*Id.* at 34). Litke further testified that he relied on an investigative report from an intake worker in preparing the praecipe, petition and affidavit for service by publication. (*Id.* at 13, 16). The only relevant references contained in the report, Plaintiffs' Exhibit 4 (Litke) here, are that the father's address was listed as

"Mexico" and that "[t]he baby's father lives in Mexico."

The intake worker who made the report on investigation of the Ortega child abuse complaint was Mike Swepston. He testified his job was to determine if there had been child abuse. (IX R. 6). He sent in a report form, Plaintiffs' Exhibit No. 4 (Litke) here, on the Ortega case. He was not involved in preparation of the affidavit for publication. (*Id.* at 13–14). Referring to the report form, he said that Sylvia Ortega told him the father's home was "Mexico" and no other whereabouts were given. He asked if she knew a specific address and she said that she did not, "Just that he was in Mexico." (*Id.* at 19).

Swepston did not ask Sylvia if she still communicated with the father or he with her. Sylvia did not tell Swepston where the father's family or relatives were. (*Id.* at 19–20). Swepston said the whereabouts of a person were unimportant to him if the person was not involved in child abuse, and in this case he would not look further beyond what he learned from his conversation with Sylvia. (*Id.* at 24). The persons preparing the petition for the state court did not contact Swepston.

What can be discerned from the records kept by the DHS employees is illuminating. Antonio Anico's identity as at least the putative father was known to DHS and the published notice of the hearing to terminate parental rights referred to him by name. (I R. 54). One month before Antonio Anico's parental rights to Johnny were terminated, DHS knew that Antonio's sister lived next door to Sylvia Ortega. (III

R. 21; IV R. 19–20; VI R. 16; Plaintiffs' Exhibit 13). Linda Green, the DHS caseworker assigned to Johnny, testified that although she was aware that Antonio Anico's sister lived next door to Sylvia, she never remembered going to see the sister to ask if she knew where Antonio could be found. (VI R. 20–21, 36). More troubling, Green did not inform the state district court judge that Antonio Anico's sister could be easily located or that Antonio had recently called Sylvia wanting to see his son,[6] even though Green attended the termination hearing. (*Id.* at 29–30). *See McKee v. Heggy*, 703 F.2d 479, 482 (10th Cir.1983) (posted public notice deficient where police knew the location of the interested party and address of interested party's parents). Moreover, shortly after the termination hearing, DHS knew the whereabouts of the parental grandparents. (III R. 17–18). *See McKee*, 703 F.2d at 482.

We are cognizant of the cautionary note sounded by Justice Jackson in *Mullane* that "[a] construction of the Due Process Clause which would place impossible or impractical obstacles in the way could not be justified." 339 U.S. at 313–14, 70 S.Ct. at 657. "But when notice is a person's due, process which is mere gesture is not due process." *Id.* at 315, 70 S.Ct. at 657. We do not hold that the Due Process Clause requires DHS to make extreme efforts to ascertain the whereabouts of parents. Nevertheless in light of the critical parental rights at stake we are convinced that due process clearly requires that DHS exert diligent efforts to locate parents before their rights are terminated.[7] *See id.* at

---

**6.** Caseworker Green's own case status report, Plaintiffs' Exhibit No. 13, noted that on August 10, 1978, approximately one month before Antonio's rights were terminated, "Ms. Ortega [Sylvia] stated Johnny's father had called from Texas wanting to see him. She stated that his sister lives next to them in Chocataw [sic]."

**7.** Defendants argue that the affidavit for service by publication which recites that "due search and diligent inquiry" were undertaken to ascertain the whereabouts of Antonio Anico were sufficient to generate a genuine issue of material fact, precluding summary judgment. We disagree for several reasons. First, the affidavit recites a conclusion of law or merely concluso-

ry facts on due diligence. A party opposing summary judgment must introduce more than conclusory facts or conclusions of law. *See* 6 J. Moore, *Moore Federal Practice* (Part I) ¶ 56.15a at 56–485.

Second, the affiant testified subsequently by deposition that he never investigated the whereabouts of the father, (VIII R. 11–17), and merely relied on Swepston's report, discussed above. In light of the depositions, the defendants are hard pressed to argue that there was a truly genuine issue of material fact. *See Bennett v. Flanigon*, 220 F.2d 799, 803 (7th Cir.1955) (deposition testimony removed issue raised by earlier allegation in complaint, permitting summary judgment); *cf. Losch v. Borough of Parkesburg*,

317, 70 S.Ct. at 658; *see also Mennonite Board of Missions v. Adams,* 462 U.S. 791, 798–99 n. 4, 103 S.Ct. 2706, 2711, n. 4, 77 L.Ed.2d 180 (1983) (a government body is not required to undertake extraordinary efforts to discover identity and whereabouts). Here, the efforts expended to locate Antonio Anico to ascertain his whereabouts or address were manifestly insufficient to satisfy the demands of the Due Process Clause. *Accord McKee,* 703 F.2d at 482 (reasonable diligent efforts include a reasonable attempt at ascertaining the name and last-known address of the interested party and informing any relatives of the interested party whose addresses were known about the actions to be taken). Therefore, the judgment of the district court must be affirmed.[8]

### III

### The Indian Child Welfare Act

The Kickapoo Tribe attempted to intervene in the adoption proceedings of Johnny, arguing that the ICWA applied. The petition to intervene was denied by the state district court which found that the ICWA did not apply. Foregoing an appeal of that decision, the Tribe sought to collaterally attack the state order in federal district court. The district court concluded that the ICWA did apply and was violated in this case.

On appeal the defendants-appellants contend that there was an order denying the Kickapoo Tribe's petition to intervene, that the order was appealable, and that no appeal was attempted after the state court ruling denying intervention. Brief of Appellants at 16. The petition for intervention of the Tribe had relied on the Indian Child Welfare Act. In the district court, the brief of the Department and the Department defendants for summary judgment argued that the provisions of 28 U.S.C. § 1738 on full faith and credit being given to state court proceedings, and res judicata principles, bar the Tribe's reassertion of the ICWA. (I R. 10–14). We agree.

The ICWA was enacted in 1978 to remedy perceived inequities in adoption standards and to protect the interest of Indian Tribes in the preservation of their valuable heritage. Guerrero, *Indian Child Welfare Act of 1978: A Response To The Threat To Indian Culture Caused By Foster And Adoptive Placements Of Indian Children,* 7 Am.Indian L.Rev. 51, 67 (1979). In the ICWA, Congress declared that part of the trust responsibility of the United States is

> to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the place-

---

*Pennsylvania,* 736 F.2d 903, 909 (3d Cir.1984) (summary judgment proper if opposing evidence is "too incredible to be believed by reasonable minds").

Further, the affidavit for service by publication and subsequent deposition testimony shows that the affiant Litke had no personal knowledge as to the efforts expended in attempting to locate the father. When relied on in proceedings under Rule 56 on summary judgment, the affidavit was insufficient to raise a genuine issue of fact because of the dictates of Fed.R. Civ.P. 56(e) that "opposing affidavits shall be made on personal knowledge."

**8.** The defendants cite the cases *Lehr v. Robertson,* 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), *Caban v. Mohammed,* 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979), and *Quilloin v. Walcott,* 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978), for the proposition that Antonio Anico should not be afforded constitutional protection in these circumstances. These cases are inapposite.

In *Lehr* the Court held that the unwed father who had never established a relationship with his two-year old daughter was not entitled to an absolute right of notice of the proceedings for adoption by the child's stepfather where New York sufficiently protected an unmarried father's inchoate relationship by the maintenance of a putative father registry; registration there would have entitled the father to notice of an adoption proceeding, but was not used. Oklahoma does not have a putative father registry or similar statutory protections, thus *Lehr* is not persuasive. Moreover, there has been no adjudication that Johnny was born out of wedlock. In *Caban* the Court observed that the father and his new wife were present at the adoption hearing in question, represented by counsel, and participated in presenting evidence. 441 U.S. at 383, 99 S.Ct. at 1763. In *Quilloin,* the Court specifically stated that the father did not challenge the sufficiency of the notice received with respect to the adoption proceedings. 434 U.S. at 253, 98 S.Ct. at 554.

ment of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.

25 U.S.C. § 1902. The ICWA "recognizes that preservation of the integrity of tribes is tied to control of adoption and foster home placement of [Indian] children." F. Cohen, Handbook of Federal Indian law 241 (1982 ed.). The ICWA provides exclusive tribal jurisdiction over child custody proceedings where the Indian child resides on the tribal reservation, and, upon application, provides for transfers of child custody proceedings from state courts to tribal courts. *See* 25 U.S.C. § 1911; *see also* F. Cohen, *supra,* at 241; Guerrero, *supra,* at 67.

Subsequent to the district court decision in this case, we decided *Kiowa Tribe of Oklahoma v. Lewis,* 777 F.2d 587 (10th Cir.1985), *cert. denied,* — U.S. —, 107 S.Ct. 247, 93 L.Ed.2d 171 (1986). There we held that a Kansas court's determination that the ICWA did not apply to a particular adoption proceeding is binding on the federal courts unless it is "so fundamentally flawed as to be denied recognition under 28 U.S.C. § 1738 [the full faith and credit statute]." *Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 480, 102 S.Ct. 1883, 1896, 72 L.Ed.2d 262 (1982). Our opinion in *Kiowa Tribe* rested on 28 U.S.C. § 1738, which requires federal courts to give the same preclusive effect to state court judgments that those judgments would be given in the courts of the state in which the judgments were rendered. *See Kremer,* 456 U.S. at 466, 102 S.Ct. at 1889; *see also* 18 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 4469, at 659–60, 669 (1981).

■ The Supreme Court has held "that § 1738 requires a federal court to look first to state preclusion law in determining the preclusive effects of a state court judgment." *Thournir v. Meyer,* 803 F.2d 1093, 1094 (10th Cir.1986) (quoting *Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373, 381, 105 S.Ct. 1327,

1332, 84 L.Ed.2d 274 (1985)). The Oklahoma courts invoke the doctrine of res judicata when the following criteria are satisfied: (1) identity of the subject matter of the claim; (2) identity of the cause of action; (3) identity of persons and parties to the action; and (4) identity of quality or capacity in persons to be affected. *Marshall v. Amos,* 442 P.2d 500, 504 (Okla. 1968).

■ Employing the analysis used in *Kiowa Tribe,* we conclude that all four criteria are met here and that the Oklahoma courts would consider the Tribe's suit barred by res judicata. First, in both suits the Tribe is essentially asserting its right to intervene in the adoption proceedings of Johnny Ortega under the ICWA; therefore, identity of the subject matter of the action is present. Second, in both suits the cause of action is based on the ICWA. Third, in both suits the Tribe and the adoptive parents are aligned as adversarial parties. Finally, there is no significant difference in the quality or capacity of the parties in the two actions.

We further conclude that the proceedings satisfied "the minimum procedural requirements of the Fourteenth Amendment's Due Process Clause." *Kiowa Tribe,* 777 F.2d at 591 (quoting *Kremer,* 455 U.S. at 481, 102 S.Ct. at 1897). The record shows that the Kickapoo Tribe was afforded due process on the issue of the applicability of the ICWA by the state district court. Therefore, the district court's opinion and judgment finding that the ICWA was applicable to this proceeding is reversed.

## IV

### Conclusion

The ruling of the district court that Antonio Anico's parental rights to Johnny Ortega were terminated in violation of the Due Process Clause, and that there be a re-determination on the custody and placement of Johnny Ortega by the state courts, is AFFIRMED. The ruling of the district court that the ICWA applied to the adoption proceedings of Johnny Ortega and that

the ICWA was violated in this case is RE-VERSED. The case is REMANDED to the district court for further proceedings on the claims for damages and injunctive relief as to the procedural due process violation; and on remand, the district court shall enter appropriate orders to permit the State courts to proceed with a re-determination on the custody and placement of Johnny Ortega.

IT IS SO ORDERED.